IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| P.V., a minor, by and through his Parents, Pedro Valentin and Yolanda Cruz, individually, and on behalf of all others similarly situated, et al., | : : : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | |
| The School District of Philadelphia, et al., | : | NO. 2:11-cv-04027 |
| Defendants. | : | |

MEMORANDUM

Legrome D. Davis, J.                                                                                  February 19, 2013

This lawsuit concerns the School District of Philadelphia's (the "School District") treatment of, and policies governing, school children with autism. The four (4) named plaintiffs in the purported class action lawsuit, P.V., M.M., J.V., and R.S.,[1] are all autistic students at Richmond Elementary School, a Kindergarten through Grade 5 ("K-5") school in the Philadelphia School District (the "School District"). (Doc. No. 1, at ¶¶ 15-18). Plaintiffs contend that the School District transfers students with autism automatically from one school to another, simply because they complete a certain grade, more frequently than the School District transfers non-disabled students who therefore, unlike autistic children, enjoy continued,

---

[1] Because the four named plaintiffs are all minors, this lawsuit was brought by and through their parents. Specifically, P.V. by and through his parents Pedro Valentin and Yolanda Cruz; M.M. by and through his parent Carla Murphy; J.V. by and through his parents Sharon Vargas and Ismael Vargas; and R.S. by and through his parents Heather Sanasac and Matthew Sanasac.

uninterrupted attendance in K-5 schools or K-8 schools. (Doc. No. 1, at ¶ 1). Plaintiffs further allege that the decision-making process leading up to the transfer of an autistic student is conducted with little to no parental notice or involvement, and without the required consideration of the children's individualized circumstances. (Doc. No. 1, at ¶ 2). Plaintiffs contend that this is particularly problematic because children with autism have difficulty transitioning from one environment to another. (Doc. No. 1, at ¶ 1).

Claiming that the School District's policy of transferring autistic students violates several statutes, the four (4) plaintiffs filed suit against the School District; the School Reform Commission; Arlene Ackerman, Superintendent of the School District of Philadelphia, in her official capacity; and Linda Williams, Interim Deputy Chief of Special Education for the School District of Philadelphia, in her official capacity (collectively, "Defendants"). Seeking systemic relief from the allegedly unlawful transfer policy, Plaintiffs filed a motion for class certification, which is now ripe for disposition.

I. FACTS

Because we write primarily for the parties involved, we discuss only the facts relevant to resolving the instant motion. Unless stated otherwise, the following facts are not in dispute. In the 2011-2012 school year, over 1600 students in K-8 in the School District were identified as having autism. (See Doc. No. 48, Ex. 28; Doc. No. 50, Ex. 11; see also Doc. No. 48, Ex. 18, at 36). The School District provides autism support classrooms for these children, which are generally divided into three "grade levels" based on age: kindergarten through second grade ("K-2"), third grade through fifth grade ("3-5"), and sixth grade through eighth grade ("6-8"). (See Doc. No. 1, at ¶ 36; Doc. No. 50, at 3). Although there are three different grade levels, a school

sometimes offers only one grade level of autism support. When a student requiring autism support completes the highest grade level provided in his or her current school, the School District transfers that student to a different school where those services can continue to be provided.[2]  (See Doc. No. 48, Ex. 21, at 43; Doc. No. 50, at 5). This process is referred to as an "upper-level transfer" or "upper-leveling." (See Doc. No. 48, Ex. 21, at 37-39, 42-43; Doc. No. 50, Ex. 13, at 37-38).

The building assignment decision is not made by a student's Individualized Education Program ("IEP") team and parents are generally not involved in the process. (See Doc. No. 48, Ex. 2, at 3, ¶ 2; Doc. No. 50, at 5). Rather, the building assignment is determined predominantly by the School District's division directors. (Doc. No. 48, Ex. 2, at 6; Ex. 3, see also Doc. No. 50, Ex. 12, at 55). To make that determination, the directors first consider the number of students coming to the School District known to require services in an autism support program, as well as building locations with available space for autism support classrooms. The directors then consider each student's IEP and "place[] each student with autism in the school that [they feel] will best meet that student's needs." (Doc. No. 50, Ex. 16, at ¶ 8).

The School District concedes that it provides parents with no written notice prior to the building assignment decision. Rather, the School District generally does not advise parents that their child will be transferred until after the decision concerning the transfer has been made. (See

---

[2] For example, a student may be in a K-2 autism support program, but the school does not offer a 3-5 program. Once that student reaches the end of his K-2 program, he would be transferred to a different school in the district that has a 3-5 program. In contrast, non-disabled students attending a K-5 school usually continue at that school for all six grade levels unless the family moves, the family requests the transfer, or for disciplinary reasons. (See Doc. No. 48, Ex. 2, at 5).

3

Doc. No. 50, Ex. 16, at 10).  The first notification to the student's parents about their child's transfer comes from the student's school, and is usually issued in late spring.  There is no formal procedure for the initial notification; parents may be informed of the transfer through a meeting, phone call, or simply an email.  (See Doc. No. 48, Ex. 21, at 66-67).  A few weeks later, the division directors send a "follow up" letter to "ensure that the parent is informed."  (Id.).  Although the School District eventually notifies parents that their child will be transferred, it admits that is has no formal policy governing the adequateness of that notification.  (See Doc. No. 48, Ex. 21, at 72-75; Ex. 23, at 86-87).

      Plaintiffs allege that the experiences of the named plaintiffs illustrate the inadequacies of the School District's process of upper-leveling students with autism in grades K-8.  For instance, P.V. is a student with autism who attends Richmond Elementary School.  At the end of the 2009-10 school year, when P.V. was finishing second grade, Richmond offered only K-2 autism support in its building.  Accordingly, the School District planned to transfer P.V. to another school when he finished second grade.  At the end of the school year, P.V.'s mother received only a verbal warning from P.V.'s teacher that P.V. might be transferred from Richmond Elementary to another school in the fall.  (Doc. No. 48, Ex. 11, at 583-84).  Despite receiving no formal or written notice about the possibility of a transfer for her child, P.V.'s mother began receiving transportation letters over the summer, indicating that P.V. would be attending Feltonville Elementary School that fall.  (Id.).  When the school year started, however, P.V.'s mother was informed through a secretary that P.V. would in fact remain at Richmond.  (Id.).

      Like P.V., M.M. is a student with autism who attends Richmond Elementary School.  On or around June 15, 2010, the School District advised M.M.'s mother via M.M.'s home-school

notebook that M.M. could no longer remain at Richmond for his third grade year during the 2010-11 school year. The note did not indicate to what school M.M. would be transferred. (See Doc. No. 48, Ex. 8, at 623-25). Throughout the summer of 2010, M.M.'s mother received no other information on the potential transfer until a few weeks prior to the start of the school year, and only after she contacted the School District directly.[3] (See id. at 625-26).

      Uncertain about where their children would be attending school that fall, the parents of P.V. and the parents of M.M. both filed for an administrative hearing in 2010, challenging, among other things, the School District's upper-leveling process. (See Doc. No. 48, Exs. 1 and 2). In a consolidated ruling, the hearing officer, Brian Jason Ford, concluded that "the District violated the Parent's right to participation by reassigning the Student [P.V. and M.M.] to a different school building without sending IDEA-compliant prior written notice." (Doc. No. 48, Exs. 1 and 2, at 15). Ford noted, however, that he "lacks authority to order wholesale changes to the District's procedures," so he merely encouraged the School District "to alter its procedures on a broader scope, if only to avoid a plethora of identical claims from similarly situated students."

---

[3] Evidence produced during discovery suggests that absent class members have shared similar experiences with respect to notification and parental involvement throughout the upper-leveling decision-making process. (See, e.g., Doc. No. 48, Ex. 16; Ex. 20, at 50-53 (student with autism sent home with only a "strip" of paper, stating that the child would be attending a different school the following year, but no indication as to the location of the student's new school, of which the parents were not informed until only a few weeks before the new school year); Doc. No. 61, Ex. 39 (An internal School District email states: "I received a call from the parent of an [autistic support] student . . . he is part of the upper level process . . . no one sent the father a letter stating where his son will attend in September . . . shall we send him a letter . . . please advise." As of July 27, 2010, the response indicated that the "[transfer] letters had not gone out yet."); see also Doc. No. 61, at 8-9).

(Id.).[4]

Plaintiffs bring this lawsuit seeking systemic relief from the School District's allegedly unlawful policy of upper-leveling children with autism.[5]  Plaintiffs emphasize that because they cannot obtain structural relief through an administrative hearing, judicial intervention and class action certification are necessary.  The injunctive relief specifically sought by Plaintiffs has somewhat varied throughout their Complaint and subsequent motions.  On a very broad scale, Plaintiffs ask this Court to order the School District to completely discontinue the upper-leveling transfer process, and require "that any school which contains an autism support classroom shall offer autism programming for the same years that the school provides programming for children who are not disabled."  (Doc. No. 1, at 21-22; see also Doc. No. 48, at 1-2).  Short of eliminating the upper-leveling process in its entirety, Plaintiffs seek this Court to order the School District to provide for a level of parental notice and involvement prior to the transfer decision that is consistent with the requirements set forth by state and federal education law.  (See Doc. No. 1, at 8; Doc. No. 17, at 2l Doc. No. 48, at 2).  To obtain that level of parental involvement, Plaintiffs maintain that the School District must publicly disseminate a list of all the schools within the School District that house any autism support classroom.  (See Doc. No. 1, at 21; Doc. No. 17, at

---

[4] Plaintiffs J.V. and R.S. had similar experiences.  The School District attempted to upper-level J.V. and R.S. – who both have autism and attend Richmond Elementary – after the second grade without issuing prior written notice or providing their parents with any meaningful level of participation in the decision-making process.  According to Plaintiffs, J.V. and R.S. prevented their transfer from Richmond only after they each filed a due process complaint.  (See Doc. No. 1, at ¶¶ 17-18; Doc. No. 48, at 11; Ex. 3, at 4; Ex. 14).

[5] Other than a demand for costs and attorney's fees, Plaintiffs seek solely injunctive and declaratory relief.  Plaintiffs do not seek compensatory education or compensatory damages.  (See Doc. No. 1, at 21-23).

2; Doc. No. 48, at 2).

The relief sought by Plaintiffs is based upon the violation of four separate statutes. Specifically, Plaintiffs allege that the process of upper-leveling violates the Individual and Disabilities Act, 20 U.S.C. § 1400 et seq. ("IDEA") and Chapter 14 of the Pennsylvania Code ("Chapter 14"), "as it occurs with little or no parental notice or involvement, without required consideration of children's individualized circumstances, and in direct violation of the mandated individual planning process of the IDEA." (Doc. No. 1, at ¶ 2; see also ¶ 56 (citing U.S.C. § 1414(d) and § 1415)). Plaintiffs contend that upper-leveling also violates § 504 of the Rehabilitation Act ("§ 504"), and Title II of the American with Disabilities Act ("ADA"), because the transfer "is based solely on the fact that children have autism." (Doc. No. 1, at ¶ 2).

Plaintiffs bring this instant motion, seeking class action certification. Specifically, Plaintiffs seek to certify a class consisting of students with autism in grade levels K-8 in the School District who have been transferred, are in the process of being transferred, or are subject to being transferred pursuant to the School District's upper-leveling policy. The proposed class definition also includes all parents and guardians of those children, and future members of the class. (See Doc. No. 48, at 12).

Defendants argue that Plaintiff's class certification motion should be denied for three separate reasons. First, Defendants argue that the named Plaintiffs lack standing. Second, Defendants contend that Plaintiffs fail to satisfy the numerosity, commonality, typicality, and adequate representation prongs of Rule 23(a). Finally, Defendants aver that Plaintiffs do not meet the certification requirements under Rule 23(b)(2). We address each argument in turn.

II.     STANDING

The existence of Article III standing is a necessary prerequisite to class certification. See McNair v. Synapse Grp., Inc., 672 F.3d 213, 223 n.10 (3d Cir. 2012) (noting that standing is a "necessary threshold issue" to review of class certification). "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." O'Shea v. Littleton, 414 U.S. 488, 493 (1973). The three "irreducible" constitutional elements of standing are: (1) an injury in fact that is actual or imminent, not "conjectural" or "hypothetical"; (2) a causal connection between the injury and the conduct complained of – the injury must be fairly traceable to the challenged action of the defendant; and (3) a showing that it is likely, as opposed to merely speculative, that a favorable decision will redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Defendants argue that the named Plaintiffs lack standing to bring claims against the School District because they were never physically transferred, and thus cannot "claim to have suffered an injury to their academic or behavioral progress from the purported policy they seek to challenge." (Doc. No. 50, at 11). However, Plaintiffs need not demonstrate actual harm or monetary damages to establish standing. On the contrary, "the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." Alston v. Countrywide Fin. Corp., 585 F.3d 753, 763 (3d Cir. 2009). Consistent with that precedent, we rejected Defendant's same argument at the motion to dismiss level, where we explained:

> Even though Plaintiffs currently attend their preferred school, Plaintiffs will

> continue to be subject to the District's allegedly IDEA-deficient educational placement process from year to year. As such, Plaintiffs' injuries are imminent, not merely conjectural or hypothetical, and a favorable court decision will likely redress the systemic failures, if any, in the District's practices regarding the educational placement and transfer of autistic students. Therefore, under Lujan, Plaintiffs have standing to pursue their claims

P.V. v. Sch. Dist. of Phila., No. 2:11-cv-04027, 2011 WL 5127850, at *11 (E.D. Pa. Oct. 31, 2011). Although this reasoning was provided over a year ago, the circumstances are such that the language remains applicable. The named Plaintiffs are in grades K-8 and attend a school in the School District, continually subjecting them to the School District's allegedly IDEA-deficient educational placement process. Therefore, for the same reasons provided at the motion to dismiss level, Plaintiffs have met the necessary prerequisite of Article III standing to pursue class certification.

III.   CLASS ACTION CERTIFICATION

    A.   Legal Standard for Class Certification

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979). Certification of a class action "is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of [Federal Rule of Civil Procedure 23] are met." In re: Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2009) (citation omitted). This "rigorous analysis" may delve beyond the pleadings and will often "entail some overlap with the merits of the plaintiff's underlying claim." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011). However, plaintiffs are not required to establish the validity of their claims at this stage. Rather, a preliminary inquiry into the merits of the case is necessary only to "determine

whether the requirements of Rule 23—namely, that the elements of the claim can be proved 'through evidence common to the class rather than individual to its members'—are met." Sullivan v. DB Investments, Inc., 667 F.3d 273, 306 (3d Cir. 2011) (quoting In re: Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311-12)).

B. Rule 23(a) Requirements

To obtain class action certification, Plaintiffs bear the burden to "establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994). Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The four requirements under Rule 23(a), generally known as numerosity, commonality, typicality, and adequacy, "assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances. While numerosity addresses the first of these concerns, . . . the last three requirements help determine whether the class action can be maintained in a fair and efficient manner." Baby Neal, 43 F.3d at 55. We review each requirement in turn.

  1. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." No minimum number of plaintiffs is required to satisfy the numerosity requirement. Stewart v. Abraham, 275 F.3d 220, 226 (3d Cir. 2001). In general, however, "if the

named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Id., at 226-227.

Here, Plaintiffs assert that the class will include at least 1600 individuals, representing the number of K-8 students in the School District who currently require autism support. (See Doc. No. 61, at 2; see also Doc. No 48, Ex. 23, at 27; Ex. 26). Defendants do not dispute that over 1600 students in the School District currently require autism support. (See Doc. No. 50, at 3 ("For the 2011-2012 school year, 1,684 [K-8] students were identified as requiring access to an autism support classroom.")). Rather, Defendants contend that the putative class does not include these students because Plaintiffs provide no proof that any of the K-8 autistic students in the School District were ever transferred pursuant to upper-leveling.

While Defendants' assertion is correct, the evidence makes clear, and Defendants admit, that any autistic student who attends the K-8 grade level in the School District will be upper-leveled if his or her school can no longer provide age-appropriate autism support. (See Doc. No. 50, at 5). Defendants go on to explain that whether autism support is offered at a particular location depends on a number of external considerations, including the number of students requiring autism support in the school that year. (See Doc. No. 50, at 4). Based on those considerations, the School District could presumably decide to remove a grade level of autism support from a particular school location, forcing an autistic student to be transferred to a different school. (See id.). Consequently, students with autism in grade levels K-8 in the School District are constantly subject to the risk of being transferred pursuant to the process of upper-leveling.

Here, Plaintiffs seek to represent those students at risk of being transferred pursuant to

11

upper-leveling, as well as those already transferred. Therefore, the putative class correctly encompasses all K-8 students with autism in the School District. Considering there are over 1600 such students, we find that joinder of these individuals would be impracticable. Moreover, the proposed class includes future members who are necessarily unidentifiable, which makes joinder even more impracticable. Accordingly, Plaintiffs have satisfied the numerosity requirement.

        2.        Commonality

Under Rule 23(a)(2), Plaintiffs must establish that "there are questions of law or fact common to the class." The Third Circuit has stated that "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Baby Neal, 43 F.3d at 56. Moreover, factual differences among the claims of the putative class members do no preclude commonality. Id. at 56. Rather, "[b]ecause the [commonality] requirement may be satisfied by a single common issue, it is easily met." Id. at 57. "This is especially true where plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them, and there is therefore no need for *individualized* determinations of the propriety of injunctive relief." Id. at 57 (emphasis in original); see, e.g., C.G. v. Pennsylvania, No. 1:06-cv-1523, 2009 WL 3182599, at *5-6 (M.D. Pa. Sept. 29, 2009) (commonality satisfied where "the class members [consisting of disabled students] each were in factually distinct situations in terms of their receipt of FAPE, but the challenge and the desired [injunctive] relief were common to all members").

Defendants contend that in order to prevail, Plaintiffs will have to obtain individualized proof of how each class member was affected by the School District's "policy" of upper-leveling.

Defendants argue that class certification should therefore be barred, on the basis that the Plaintiff's individualized factual situations foreclose a finding of commonality.[6] Defendants fail to recognize, however, that the central tenet of Plaintiffs' Complaint alleges a systemic failure, not a failure of the policy as applied to each member individually. Plaintiffs claim that the School District's "policy" of upper-leveling K-8 autistic students, which allegedly involves little to no parental involvement or consideration of autistic students' individual needs, constitutes a violation of the IDEA, Chapter 14, ADA, and § 504.

Plaintiffs correctly point out that their systemic challenge requires a number of factual and legal determinations, common to all class members. These common questions of fact or law include whether the School District upper-levels autistic students without meaningful parental involvement, whether the School District upper-levels autistic students without providing prior written notice to the parents, whether the School District considers the individual needs of autistic students prior to deciding where to upper-level that student, and whether the School District's "policy" of upper-leveling deprives putative class members of a free and appropriate public education.   Therefore, Plaintiffs have satisfied the commonality requirement.

---

[6] To support their argument, Defendants cite Blunt v. Lower Merion Sch. Dist., 262 F.R.D. 481, 489-90 (E.D. Pa. 2009) for the proposition that individualized proof is necessary to determine whether a school district violates the IDEA. However, unlike this case, the plaintiffs in Blunt who moved for class certification sought "not only injunctive and declaratory relief, but also compensatory education for each of the named plaintiffs and members of the class who were deprived an adequate education." Id. at 490.  As the Third Circuit has explained, a request for damages typically requires individualized determinations of harm.  See Baby Neal, 43 F.3d at 57 (noting that because "they do not also involve an individualized inquiry for the determination of damage awards, injunctive actions by their very nature often present common questions satisfying Rule 23(a)(2)").  Therefore, Defendants' reliance on Blunt to negate a finding of commonality here is misplaced.

3.     Typicality

To satisfy Rule 23(a)(3), Plaintiffs must prove that their claims or defenses are "typical of the claims or defenses of the class." The typicality requirement is intended to ensure that the incentives of the named plaintiffs align with those of absent class members. Baby Neal, 43 F.3d at 57. The common claims should be "comparably central to the claims of the named plaintiffs" and not create a potential conflict. Id. (citing Weiss v. York Hosp., 745 F.2d 786, 810 (3d Cir. 1984)). The Third Circuit has also articulated that "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims. . . . Actions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold." Id. at 58 (internal citation omitted).

Here, named Plaintiffs and the putative class challenge the same allegedly unlawful conduct of upper-leveling students with autism, and seek injunctive relief to remedy that conduct. The systemic challenge to the School District's process of upper-leveling autistic students is clearly the central issue to all claims. Defendants contend, however, that Plaintiffs' claims do not align with the incentives of the representative class because "the best placement for a particular student [in the putative class] might not be in a school building that offers autism support for all grades." (Doc. No. 50, at 16).

Defendants' argument may be persuasive if Plaintiffs sought *only* for this Court to require schools that offer autism support for any grade level to offer autism support for every grade level in that building. On the contrary, the crux of Plaintiffs' requested relief focuses on providing parents of autistic children with more information and a greater opportunity to get involved with

the decision to transfer their child. Defendants do not address how providing greater parental involvement conflicts with the incentives of the representative class members to place their children in the most appropriate learning environment. Providing parents the opportunity to participate in the decisions that affect their children's education, as well as the information necessary to make informed decisions, would seem only to help ensure the parent's child is placed in his or her most appropriate classroom environment. We therefore find that the typicality requirement is met.

### 4. Adequacy of Representation

To meet the fourth and final 23(a) prong, Plaintiffs must prove that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The primary purpose of Rule 23(a)(4) is "to uncover conflicts of interest between named parties and the class they seek to represent." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004). Proof of "'[a]dequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) (quoting Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975)).

Defendants do not dispute the qualifications of proposed class counsel. Instead, Defendants largely reiterate their typicality argument by contending that an intra-class conflict exists because some putative class member may prefer not to "attend schools that have autism support for all grades." (Doc. No. 50, at 18). We already rejected this argument when Defendants moved to strike class action allegations prior to discovery, under the following

rationale:

> Plaintiffs certainly do not explicitly request that we forbid "any school that is incapable of offering autism support classes to all grade levels from offering [autism support] to any grade levels in that school" or eliminate "autism support classes in many neighborhood schools." Defendants merely speculate that forcing the District to change its practices regarding transferring autistic students will have the aforementioned results.
>
> Additionally, much of Plaintiffs' requested relief focuses on providing parents of autistic children with more information and a greater opportunity to get involved with their children's educational placement. We cannot see how this relief would divide the Plaintiffs' proposed class to such an extent that an inherent conflict of interest among the class members would prohibit class certification. Parents may or may not take advantage of the opportunity to participate in the decisions that affect their children's education. However, merely giving parents the option to do so, as well as the information necessary to make informed decisions, would not appear to be a particularly controversial or divisive issue among the autistic community.

P.V. v. Sch. Dist. of Phila., No. 2:11-cv-04027, 2011 WL 5127850, at *5-6 (E.D. Pa. Oct. 31, 2011) (alterations in original). No additional evidence or authority has been presented to this Court to make the reasoning provided in our previous Order any less applicable.[7] We therefore conclude that Plaintiffs have satisfied all four of the Rule 23(a) factors, including adequate representation.

---

[7] The reasoning provided in McClendon v. Sch. Dist. of Phila., No. 04-1250, 2005 WL 549532 (E.D. Pa. Mar. 7, 2005), on which Defendants rely, is not applicable to this case. Unlike here, the plaintiffs in McClendon sought compensatory damages based on each plaintiff's individual agreement. It was precisely because the plaintiffs in McClendon sought compensatory relief that the court determined "[c]ertification of a class would compromise the individual plaintiff's freedom to resolve their individual cases." The McClendon court expressly recognized that its case was distinguishable from Baby Neal, where the plaintiffs sought only injunctive relief. McClendon, 2005 WL 549532, at *4; see also Baby Neal, 43 F.3d at 63 ("It bears remembering that the plaintiffs here seek only injunctive and declaratory relief; there are no other claims that could compromise the named plaintiffs' pursuit of the class claims.").

C.     Rule 23(b)(2) Analysis

Rule 23(b)(2) authorizes class action treatment for cases that seek injunctive relief.[8] The Third Circuit has held that Rule 23(b)(2) "is almost automatically satisfied in actions primarily seeking injunctive relief" from systemic violations of basic rights. Baby Neal, 43 F.3d at 58, 64; see also Weiss v. York Hosp., 745 F.2d 786, 811 (3d Cir. 1984) ("When a suit seeks to define the relationship between the defendant(s) and the world at large, as in this case, (b)(2) certification is appropriate."). What is important for purposes of satisfying Rule 23(b)(2) is that the relief sought by the named plaintiffs benefits the entire class. Id. at 59.

Defendants argue that given the binding effects of a 23(b)(2) class certification, "absent members of the putative class at issue will effectively be forced to cede to the named plaintiffs and their counsel control over critical decisions regarding their children's education." (Doc. No. 50, at 20). Defendants contend that such a result goes directly against the purpose of the IDEA, "which is to create a framework that enables parents and educational professionals to work together." (Id.).

Defendants' familiar argument once again fails to consider the extent of the relief sought by Plaintiffs. Despite Defendants' persistent contention to the contrary, Plaintiffs do not seek to dictate where to locate the autism support programs provided to children in the School District. Rather, as already discussed, Plaintiffs mainly seek systemic relief that will provide the opportunity for greater parental involvement to all putative class members in making decisions that allegedly affect the educational placement of their children—relief that is entirely consistent with the IDEA's promotion of parent-school cooperation. Because the injunctive relief sought by

---

[8] Rule 23(b)(2) states: "A class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Plaintiffs will benefit the entire class, we conclude that this action is within the type that Rule 23(b)(2) was designed to authorize.[9]

III.     CONCLUSION

Based on the foregoing considerations, the Court finds that all the requirements for class certification are met.  Accordingly, this action is certified as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) on behalf of the following class: All children with autism in the School District of Philadelphia in grades kindergarten through eight ("K-8") who have been transferred, are in the process of being transferred, or are at risk of being transferred, as a result of the School District's upper-leveling process, the parents and guardians of those children, and future members of the class.  An appropriate order follows this memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.

---

[9] Because Plaintiffs need only satisfy one subparagraph of Rule 23(b) to certify a class, we need not address Plaintiff's alternative argument that this case also satisfies the requirements of Rule 23(b)(3).