IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| P.V., a minor, by and through his Parents, Pedro Valentin and Yolanda Cruz, individually, and on behalf of all others similarly situated, et al., | : : : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | |
| The School District of Philadelphia, et al., | : | NO. 2:11-cv-04027 |
| Defendants. | : | |

MEMORANDUM

Legrome D. Davis, J.                                                                               February 19, 2013

I.   BACKGROUND

   A.   Statutory Framework of IDEA

The crux of Plaintiffs' case relates to alleged violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. (1996). Before addressing the facts, it is helpful to understand the statutory framework of the IDEA. The IDEA seeks to provide all children with disabilities with "a free appropriate public education ["FAPE"] which emphasizes special education and related services to meet their unique needs." 20 U.S.C. § 1400. To ensure that the disabled child receives an educational program tailored to his or her specific needs, the child's parents, teacher, and a representative of the local education agency collaborate to design an "individualized education program" ("IEP") for the child. 20 U.S.C. § 1414. Based on the child's individual needs, the IEP sets forth the child's educational level,

1

performance, and goals.

After the IEP is drafted, the School District issues a Notice of Recommended Educational Placement ("NOREP"),[1] which contains a form to either approve or disapprove the IEP. The NOREP must include a description and explanation of the action taken by the school district and a disclosure that the child's parents may challenge the school district's decision. See § 1415(c). To ensure parents retain the opportunity to stay involved on decisions affecting their child's IEP, the parents must also be provided with a NOREP whenever the school district "proposes to initiate or change" the "educational placement of the child." 20 U.S.C. § 1415.

B.   Factual Background and Procedural History

This class action was initiated by parents of students with autism, who allege that the School District of Philadelphia (the "School District") transfers autistic students in kindergarten through eighth grade ("K-8") without providing the level of parental notice and involvement required under state and federal law. Seeking systemic relief for the alleged violations, Plaintiffs filed a motion for class certification, which we granted.[2]

In the 2011-2012 school year, 1,684 students in K-8 in the School District were identified as having autism (See Doc. No. 51, Ex. 8), most of whom require access to an autistic support

---

[1] NOREP is essentially the state version of "Prior Written Notice" under § 1415 of the IDEA. (See Doc. No. 51, Ex. 3, at 12). The two phrases will be used interchangeably throughout this opinion.

[2] The class is defined as:

> All children with autism in the School District of Philadelphia in grades kindergarten through eight ("K-8") who have been transferred, are in the process of being transferred, or are at risk of being transferred, as a result of the School District's upper-leveling process, the parents and guardians of those children, and future members of the class.

classroom.  (See Doc. No. 51, Ex. 21, at 55).  Depending on the child's age, he or she will be placed into one of three autistic support classrooms based on "grade level": kindergarten through second grade ("K-2"), third grade through fifth grade ("3-5"), and sixth grade through eighth grade ("6-8").  (See Doc. No. 51, Ex. 3, at ¶ 2).  Although there are three different groups, a school sometimes offers only one grade level of autistic support.  When a student requiring autism support completes the highest grade level provided in his or her current school, the School District transfers that student to a different school where those services can continue to be provided.[3]   (See Doc. No. 49, Ex. L, at 43; Ex. G, at 104).  This process is referred to as an "upper-level transfer" or "upper leveling."[4]  (See Doc. No. 49, Ex. L, at 38; Doc. No. 51-1, at ¶ 10; Doc. No. 51, Ex. 3, at ¶¶ 14-16).

The building assignment decision is not made by a student's IEP team and parents are generally not involved in the process.  (See Doc. No. 51, Ex. 21, at 57; Doc. No. 51, Ex. 3, at ¶ 23; Doc. No. 54, at ¶ 25).  Rather, the building assignment is determined "pretty much unilaterally" by the School District's division directors.  (Doc. No. 51, Ex. 3, at ¶ 23; see also Doc. No. 49, Ex. L, at 55).  To make the determination, the directors first consider the number of

---

[3] For example, a student may be in a K-2 program, but the school does not have a 3-5 program.  Once that student reaches the end of his K-2 program, he would be transferred to a different school in the district that has a 3-5 program.  In contrast, a non-disabled student attending a K-5 school generally continues at that school for all six grade levels unless she moves or is transferred for disciplinary reasons.

[4] "Upper-leveling" does not seem to be limited to the transfer of students with autism.  Rather, it seems to refer more generally to the transfer of any student, including non-disabled students, that reach the end of their age-limit grade.  (See Doc. No. 49, Ex. M, at 38; Doc. No. 54, Ex. 8, at 38).  However, for purposes of this Memorandum, "upper-leveling" refers strictly to the transfer of children with autism to different schools within the School District when they reach the end of their age-limit grade.

students coming to the School District known to require services in an autistic support program, as well as building locations with available space for autistic support classrooms. The directors then consider each student's IEP and "place[] each student with autism in the school that [they feel] will best meet that student's needs." (Doc. No. 51, Ex. 20, at ¶ 8).

The School District concedes that it provides parents with no written notice prior to the building assignment decision. Rather, the School District generally does not advise parents that their child will be transferred until after the decision concerning the transfer has been made. (See Doc. No. 54-1, at ¶ 31). The first notification to the student's parents about their child's transfer comes from the student's school, and is usually issued in late spring. There is no formal procedure for the initial notification; parents may be informed of the transfer through a meeting, phone call, or simply an email. (See Doc. No. 48, Ex. 21, at 66-67). A few weeks later, the division directors send a "follow up" letter to "ensure that the parent is informed." (Id.).

Although the School District eventually notifies parents that their child will be transferred, it admits that is has no formal policy governing the adequateness of that notification. (See Doc. No. 54-1, at ¶ 36). The discovery materials provided by Plaintiffs reflect that the notification given to parents about the transfer of their autistic child is often terse, at best. In one instance, for example, a student with autism was sent home with only a "strip" of paper, stating that the child would be attending a different school the following year. The strip of paper did not include the location of the student's new school, of which the parents were not informed until only a few weeks before the new school year. (See Doc. No. 51-1, Ex. 22; Ex. 32, at 50-53; see also Doc. No. 51-1, at ¶ 40; Doc. No. 54-1, at ¶ 40).

In another instance, the mother of an autistic child received only an oral comment from

her child's teacher, telling her that her child might be transferred from Richmond Elementary to another school in the fall. Despite receiving no formal or written notice about the possibility of a transfer for her child, the mother began receiving transportation letters, indicating that her child would be attending Feltonville Elementary School that fall. When the school year started, however, the child's mother was informed through a secretary that her son would actually remain at Richmond. (See Doc. No. 51-1, Ex. 31, at 583-84; see also Doc. No. 51-1, at ¶ 39; Doc. No. 41, at ¶ 39). Plaintiffs present additional evidence, reflecting similar scenarios.[5]

Plaintiffs now bring this class action lawsuit against the School District of Philadelphia, seeking systemic relief from the allegedly unlawful process of "upper leveling." Throughout this litigation process, the declaratory and prospective injunctive relief sought by Plaintiffs has seemingly varied between the Complaint and subsequent motions. On a very broad scale, Plaintiffs ask this Court to order the School District to completely discontinue the upper-leveling transfer process, and require "that any school which contains an autism support classroom shall offer autism programming for the same years that the school provides programming for children who are not disabled." (Doc. No. 1, at 21-22; see also Doc. No. 48, at 1-2). Short of eliminating the upper-leveling process in its entirety, Plaintiffs seek this Court to order the School District to provide for a level of parental notice and involvement prior to the transfer decision that is consistent with the requirements set forth by state and federal education law. (See Doc. No. 1, at 8; Doc. No. 17, at 2l Doc. No. 48, at 2). To obtain that level of parental involvement, Plaintiffs

---

[5] See, e.g., Doc. No. 61, Ex. 39 (An internal School District email states: "I received a call from the parent of an [autistic support] student . . . he is part of the upper level process . . . no one sent the father a letter stating where his son will attend in September . . . shall we send him a letter . . . please advise." As of July 27, 2010, the response indicated that the "[transfer] letters had not gone out yet.").

maintain that the School District must publicly disseminate a list of all the schools within the School District that house any autistic support classroom.  (See Doc. No. 1, at 21; Doc. No. 17, at 2; Doc. No. 48, at 2).

Plaintiffs emphasize that they cannot obtain this structural relief through an administrative hearing, so judicial intervention is necessary.  Specifically, Brian Jason Ford, the hearing officer presiding over P.V.'s and M.M.'s (two of the four named plaintiffs) administrative hearings, concluded that "the District violated the Parent's right to participation by reassigning the Student [P.V. and M.M.] to a different school building without sending IDEA-compliant prior written notice." (Doc. No. 51, Ex. 3, at 15; Ex. 4, at 16).  Ford noted, however, that he "lacks authority to order wholesale changes to the District's procedures," so he merely encouraged the School District "to alter its procedures on a broader scope, if only to avoid a plethora of identical claims from similarly situated students."  (Id.).

Plaintiffs bring this class action seeking systemic relief from the School District's process of upper-leveling children with autism.  In the first two counts of the Complaint, Plaintiffs allege that the process of upper-leveling violates the Individual and Disabilities Act, 20 U.S.C. § 1400 et seq. ("IDEA") and Chapter 14 of the Pennsylvania Code ("Chapter 14"), "as it occurs with little or no parental notice or involvement, without required consideration of children's individualized circumstances, and in direct violation of the mandated individual planning process of the IDEA."  In the other two counts, Plaintiffs contend that upper-leveling violates § 504 of the Rehabilitation Act ("§ 504"), and Title II of the American with Disabilities Act ("ADA"), because the transfer "is based solely on the fact that children have autism."  (Doc. No. 1, at ¶ 2). Both parties have filed motions for summary judgment, which are now ripe for disposition.

II.     LEGAL ANALYSIS

   A.     Standard of Review

      1.     <u>Summary Judgment</u>

Under Federal Rule of Civil Procedure 56(a), we must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Accordingly, the nonmoving party cannot avoid summary judgment "merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case." <u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 484 (3d Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 322). "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). Where, as here, the parties file cross-motions for summary judgment, the Court "construes facts and draws inferences in favor of the party against whom the motion under consideration is made." <u>Pichler v. UNITE</u>, 542 F.3d 380, 386 (3d Cir. 2008) (quotation omitted).

      2.     <u>Review of Administrative Record</u>

The Third Circuit makes clear that a district court must review an IDEA decision by a state administrative agency under a "modified" de novo standard. <u>L.E. v. Ramsey Bd. of Educ.</u>, 435 F.3d 384, 389 (3d Cir. 2006). Under this modified standard, we must afford "due weight" to the factual findings from the administrative proceedings, and consider those facts "prima facie"

correct.  See id., S.H. v. State-Operated School Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003).  The District Court may, as the case here, consider evidence in addition to the factual record developed at the administrative level.  "[W]here the District Court hears additional evidence it is 'free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the [IDEA].'"  Id. (quoting Oberti v. Bd. of Educ. of the Borough of the Clementon Sch. Dist., 995 F.2d 1204, 1220 (3d Cir. 1993)).

Notably, the "due weight" given to the factual findings from the administrative proceedings is "'not implicated with respect to the issues of law, such as the proper interpretation of the [IDEA] and its requirements,' that is, the district court owes no deference to conclusions of law drawn by a state or local educational agency."  In re: Educational Assignment of Joseph R., 318 Fed. Appx. 113, 118 (3d Cir. 2009) (non-precedential) (quoting Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 82 (2d Cir. 2005)).

B.   Standing

The three "irreducible" constitutional elements of standing are: (1) an injury in fact that is actual or imminent, not "conjectural" or "hypothetical"; (2) a causal connection between the injury and the conduct complained of – the injury must be fairly traceable to the challenged action of the defendant; and (3) a showing that it is likely, as opposed to merely speculative, that a favorable decision will redress the injury.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Plaintiffs need not demonstrate actual harm or monetary damages to establish standing.  On the contrary, "the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."  Alston v.

8

Countrywide Fin. Corp., 585 F.3d 753, 763 (3d Cir. 2009).

Here, Defendants once again contend that Plaintiffs lack standing because they were never physically transferred pursuant to the District's upper-leveling process, and therefore, have suffered no "injury in fact." Defendants raised this same argument at the motion to dismiss level, which we rejected. We explained that:

> Even though Plaintiffs currently attend their preferred school, Plaintiffs will continue to be subject to the District's allegedly IDEA-deficient educational placement process from year to year. As such, Plaintiffs' injuries are imminent, not merely conjectural or hypothetical, and a favorable court decision will likely redress the systemic failures, if any, in the District's practices regarding the educational placement and transfer of autistic students. Therefore, under Lujan, Plaintiffs have standing to pursue their claims.

P.V. v. Sch. Dist. of Phila., No. 2:11-cv-04027, 2011 WL 5127850, at *11 (E.D. Pa. Oct. 31, 2011).

Defendants further argue that Plaintiffs provide no evidence of "any student whose academic or behavioral progress has ever been adversely affected by transfer." (Def.'s Mot. for Sum. Judgment, at 12). Regardless, Defendants fail to realize that the crux of Plaintiff's IDEA claim stems from the School District's lack of parental involvement *leading up to* the transfer decision of their student. As we discuss infra, Plaintiffs do provide evidence that the School District provides almost no parental involvement or notice prior to the transfer decisions, which Plaintiffs allege is a violation of the IDEA. For all the foregoing reasons, Plaintiffs have standing under Lujan to pursue their claims.

9

C. IDEA & Chapter 14[6]

Courts generally conduct a two-step inquiry to determine whether a school district complied with the IDEA. First, courts determine whether the school district complied with the procedural safeguards set forth by the IDEA and state law. Second, the court evaluates whether the IEP is reasonably calculated to enable the child to receive educational benefit. D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 565 (3d Cir. 2010). However, the second step is unnecessary if the violation of the IDEA's procedure "results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." Id. Accordingly, our inquiry begins with whether the School District violated any procedural safeguards under the IDEA.

1. The Meaning of "Educational Placement" Under the IDEA

Both parties recognize that under the procedural safeguards of the IDEA, the School District must provide for meaningful parental participation and prior written notice whenever it initiates or proposes to change the "educational placement" of a child.[7] Plaintiffs allege that the School District's process of upper-leveling autistic students violates the IDEA's procedural safeguards because it changes an autistic student's educational placement without notifying

---

[6] Chapter 14 reflects Pennsylvania's compliance with the IDEA requirements, and incorporates federal IDEA regulations. 22 Pa. Code § 14.102.

[7] See 20 U.S.C. § 1415(b)(1),(3) (stating that there must be "[a]n opportunity for the parents of a child with a disability . . . to participate in meetings with respect to the . . . educational placement of the child . . ." and provision of "[w]ritten prior notice to the parents of the child, in accordance with subsection (c)(1), whenever the local educational agency proposes to initiate or change . . . the . . . educational placement of the child . . ."); see also 20 U.S.C. § 1414(e) (requiring "that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child").

parents prior to the decision and also precludes parents from participating in the transfer decision. The School District contends that there is no legal requirement to involve parents in the transfer decision because upper-leveling does not change a student's educational placement.

Specifically, Defendants argue that "educational placement" refers only to "educational programming and services – not the location at which a student receives educational programming and services." (Doc. No. 54, at 7). Because there is no proof or claim that the programming and services provided at different schools within the district vary in any relevant respect, Defendants contend that upper-leveling is simply changing the physical location of where an autistic student receives his IEP. Thus, this Court must resolve whether transferring students with autism to a different a school building within the same school district constitutes a change in "educational placement" for purposes of requiring parental involvement under the IDEA.

Unfortunately, neither the text nor legislative history of the IDEA defines the term "educational placement." The Third Circuit has stated, however, that "given the remedial purposes of the [IDEA], the term . . . should be given an expansive reading." DeLeon v. Susquehanna Cmty. School Dist., 747 F.2d 149, 153 (3d Cir. 1984). The touchstone of whether a modification in a child's school day should be considered a change in his or her educational placement is "whether the decision is likely to affect in some significant way the child's learning experience." Id. Thus, "[t]he question of what constitutes a change in educational placement is, necessarily, fact specific." Id. at 153.

"As a general matter, the location of the services is not conclusive in determining what

constitutes the educational placement of the student." George A. v. Wallingford Swarthmore School Dist., 655 F. Supp. 2d 546, 550 (E.D. Pa. Sep. 3, 2009). However, "[location] cannot be entirely divorced from the inquiry." Id. For instance, courts in the Third Circuit have recognized that distance between classrooms, available facilities, or a student's history at a particular school are relevant to the determination of educational placement. See, e.g., R.B. v. Mastery Charter School, 762 F. Supp. 2d 745, 763 (E.D. Pa. Dec. 29, 2010); George A., 655 F. Supp. 2d at 551. Thus, "[t]he meaning of 'educational placement' falls somewhere between the physical school attended by a child and the abstract goals of a child's IEP." R.B., 762 F. Supp. 2d at 763 (citations and internal quotation marks omitted).

To support its contention that upper-leveling is not a change in an autistic student's educational placement, the School District relies on In re Educ. Assignment of Joseph R., 318 Fed. Appx. 113 (3d Cir. 2009). Even in this non-precedential opinion, the Third Circuit recognizes that determining what constitutes a change in educational placement is a fact-intensive inquiry. Based on the facts before it, the court in Joseph R., held that relocating a student with learning disabilities from a resource classroom to an inclusion classroom within the same building did not amount to a "change in educational placement" under the IDEA. In Joseph R., plaintiffs provided no evidence that the move to an inclusion room would likely affect the student's learning experience in any significant way. The student received the same educational services on a daily basis, with the same special education teacher, but in a different room in the building.

While seemingly similar to Joseph R. at first glance, the facts in this case are materially

12

distinguishable and warrant different considerations. Unlike Joseph R., upper-leveling does not involve moving a child to a new classroom within the same school; rather, it relocates a child to an entirely novice infrastructure. Unlike an intra-school transition, as was the case in Joseph R., a transfer to a different school building often requires a longer commute on the bus, separation from former classmates, and acclimation to an unfamiliar environment. (See Doc. No. 51, Ex. 16, at 195).

The physical adjustments accompanied by an upper-level transfer are significant because of another major factual distinction: the students being transferred in this case have autism. In Joseph R., there was no indication that because the student had a learning disability, a change in his physical location may affect his learning experience. In contrast, an unplanned transition for children with autism is likely to affect their learning rate and learning sequences. (See Doc. No. 49, Ex. Q, at 31). This is because difficulty with transition is one of the *defining* characteristics of children with autism. (See Doc. No. 51, Ex. 1, at 4). Thus, despite the School District's contention to the contrary, upper-leveling students with autism does not merely change their physical surroundings; the transition is likely to have a significant impact on their learning experience. Accordingly, we must conclude that under the particular facts of our case, upper-leveling students with autism to a separate school building in the School District constitutes a change in their "educational placement" under the IDEA.

The cases outside of the Third Circuit to which the School District cites do not suggest a different outcome. From the number of out-of-circuit appellate decisions purported to support its contention, the School District lists only one that involves a student with autism: T.Y. v. N.Y.

City Department of Education, 584 F.3d 412 (2d Cir. 2009).  The Third Circuit has never adopted T.Y., and regardless, its holding is not contrary to our conclusion.  The court in T.Y., "simply [held] that an IEP's failure to identify a specific school location will not constitute a *per se* procedural violation of the IDEA."  Id. at 420.  Notably, the parents in T.Y. participated in selecting the school for their child prior to the final assignment and "worked cooperatively" with the school district in arriving at the decision.  Therefore, the School District's reliance on T.Y., in this case is misplaced.

The only factually analogous case that the School District cites is an unreported opinion that stems from the Middle District of Florida.  In L.M. v. Pinellas County School Board, the district court found that the transfer of a student with autism from one school to another in the district "does not amount to a change in her educational placement within the meaning of the stay-put provision."  No. 10-539, 2010 U.S. Dist. LEXIS 46796, at *5 (M.D. Fla. April 11, 2010).  In reaching its conclusion, the short opinion relied upon cases outside the Third Circuit, and gave short shrift to the role of transition for children with autism.  Thus, beyond its non-binding effect in the Third Circuit, the L.M. opinion is simply not persuasive.

       3.       Parental Participation and Prior Written Notice Requirements

Because we conclude that upper-leveling constitutes a change in "educational placement" for students with autism, we must now determine whether the School District's current level of parental participation and prior written notice suffices under the procedural safeguards of the IDEA.  The School District concedes it does not permit the students' parents to participate in the transfer decisions on any meaningful level.  Instead, parents learn of the new building assignment

14

only after it has been unilaterally decided upon by division directors, with no opportunity for parents to contribute to the discussion. The notification is sometimes no more than one sentence on a strip of paper, informing the parent that their child will be attending a different school in the fall.

Moreover, the notification is generally sent only weeks prior to the start of the next school year, leaving parents minimal time to plan for their autistic child's transition from one educational setting to another. Such terse notification falls short of the IDEA's procedural safeguards, which require, among other things, a written explanation of why the transfer is proposed, what other options were considered, and why those other options were rejected. See § 1415(c). We therefore conclude that the School District's process of upper-leveling children with autism violates the procedural safeguards under the IDEA, and "seriously deprives" parents the opportunity to participate in the decision-making process regarding the educational placement of their autistic child. Accordingly, the School District is ordered to alter its upper-leveling process for children with autism to provide prior written notice and a level of parental participation that complies with the procedural requirements under the IDEA.[8]

We emphasize that the School District retains "'significant authority to select the school site, as long as it is educationally appropriate.'" Lebron v. North Penn School Dist., 769 F. Supp. 2d 788, 800 (E.D. Pa. Feb. 14, 2011) (quoting White ex rel. v. Ascension Parish Sch. Bd., 343

---

[8] Because we conclude that the School District's violation of the IDEA's procedural safeguards seriously deprives parents of their participation rights, we need not address Plaintiffs' claim that upper-leveling fails to comport with IEP requirements.

F.3d 373, 382 (2003).[9] By no means does our holding suggest that parents of children with autism are entitled to any type of "veto power" over the final location decision. We simply conclude that under the IDEA, the School District cannot categorically deny parents the opportunity to provide input and receive notice about the educational placement of their autistic child.

      E.      ADA & § 504 of the Rehabilitation Act

In addition to alleging violations of the IDEA and Chapter 14, Plaintiffs also contend that the School District's process of upper-leveling violates the ADA and § 504 of the Rehabilitation Act. Unlike their IDEA claim, however, Plaintiffs seem not to allege that the violation stems from a lack of parental participation or prior notice. Rather, Plaintiffs argue that transferring autistic students at a grade earlier than non-disabled children constitutes discrimination and an unreasonable accommodation in violation of the ADA and § 504. (See Doc. No. 51, at 23).

To establish a violation of § 504 of the Rehabilitation Act,[10] Plaintiffs must prove that (1) they are disabled; (2) they are "otherwise qualified" to participate in school activities; (3) the School District received federal financial assistance; and (4) they were excluded from

---

[9] For that reason, we refuse to force the School District to provide parents a list of the building locations of autistic support classrooms. Beyond conclusory allegations, Plaintiffs provide no evidence that such a list is necessary to effectuate the School District's compliance with the procedural requirements of the IDEA.

[10] The elements of a claim under the ADA and § 504 are nearly identical. The only difference is that § 504 also requires the entity against whom the violation is alleged to receive federal assistance. See Muhammad v. Court of Common Pleas of Allegheny Cnty., Pa, 483 Fed. Appx. 759, 762-763 (3d Cir. 2012) (citing Helen L. v. DiDario, 46 F.3d 325, 330 n.7 (3d Cir. 1995)).

participation in, denied the benefits of, or subject to discrimination by the School District. Ridley School Dist. v. M.R. 680 F.3d 260, 280 (3d Cir. 2012) (citing Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999)). The parties do not dispute the first three elements. (See Doc. No. 49, at 37). Rather, the only issue is whether Plaintiffs were denied the benefit of an education program or were subject to discrimination by the School District.

Plaintiffs allege that the School District's upper-leveling policy creates an inference of discrimination. (See Doc. No. 62, at 23). Courts in the Third Circuit have observed that for purposes of ADA and § 504, discrimination can be inferred from a school district's "deliberate indifference" toward its students with disabilities. See, e.g., Chambers v. School Dist. of Philadelphia Bd. of Educ., 827 F. Supp. 2d 409, 425 (E.D. Pa. Oct. 24, 2011); Adam C. v. Scranton Sch. Dist., No. 3:07-cv-532, 2011 WL 4072756, at *5-6 (M.D. Pa. Sept. 13, 2011). Here, Plaintiffs contend that the School District is deliberately indifferent to students with autism because it will "knowingly upper-level transfer students without regard to their individual needs." (Doc.No. 64, at 12). The record makes clear, however, that the School District does not make any transfer decisions until taking into account each student's *individualized* education plan. (See Doc. No. 51, Ex. 19, at 8). Moreover, the School District ensures that the student is transferred to the appropriate school building nearest to his or her home. (See Doc. No. 54, Ex. 8, at 72). Despite the lack of parental involvement in these decisions, there is no indication that the School District knew about the accommodations required for students with autism and chose deliberately to ignore them. To the contrary, the School District upper-levels students with autism in order to provide them with adequate accommodations.

Plaintiffs also contend that transferring students with autism to different schools within the district is not a reasonable accommodation under the ADA and § 504. Plaintiffs argue that this Court should require the School District to "ensure that any [K-8] school which contains an autism support classroom shall offer autism programming for the same years that the school provides programming for children who are disabled." (Doc. No. 1, at 22).

Under § 504, a "school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." Ridley School Dist. v. M.R. 680 F.3d 260, 280 (3d Cir. 2012) (citations omitted). "However, § 504 does not mandate 'substantial' changes to the school's programs, and courts should be mindful of the need to strike a balance between the rights of the student and h[er] parents and the legitimate financial and administrative concerns of the [s]chool [d]istrict." Id., at 180-81 (internal quotation marks and citation omitted).

Here, presumably due to financial and administrative concerns, the School District does not provide autistic support in every grade level at every school in the District. As a result, the School District must sometimes transfer a student with autism to a different school to ensure that he or she receives the services and programs set forth in his or her IEP in an age-appropriate setting. As we discussed at length earlier, such a transition is likely to affect the educational experience of a child with autism. Beyond that, however, Plaintiffs provide no proof that the services received by a transferred student with autism are deficient, so as to prevent that student from gaining a meaningful access to educational benefits. Compare Adam C., 2011 U.S. Dist. LEXIS 102981. To the contrary, the students are transferred to ensure they continue to receive

adequate services pursuant to their IEP.  For that reason, we cannot find that transferring students with autism to ensure they receive their IEP in an age-appropriate setting is an unreasonable accommodation under the ADA or § 504.

III.    CONCLUSION

First, we conclude that  Plaintiffs have standing to pursue their claims.  Second, we conclude that the School District's process of upper-leveling children with autism violates the procedural safeguards under the IDEA, and seriously deprives parents the opportunity to participate in the decision-making process regarding the educational placement of their autistic child.  Third, we conclude that the School District's process of upper-leveling children with autism does not violate the ADA or § 504 of the Rehabilitation Act.  Accordingly, Plaintiffs' Motion for Summary Judgment (Doc. No. 51) is GRANTED in part and DENIED in part.  Similarly, Defendants' Motion for Summary Judgment (Doc. No. 49) is GRANTED in part and DENIED in part.  An appropriate Order follows this Memorandum.


BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.